ROMAN CATHOLIC DIOCESE OF NEWARK, A RELIGIOUS CORPORATION OF THE STATE OF NEW JERSEY, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. BOROUGH OF HO-HO-KUS, A MUNICIPAL CORPORATION OF THE COUNTY OF BERGEN AND STATE OF NEW JERSEY, DEFEND-ANT-APPELLANT, AND CHARLES A. BELTRAMINI AND ELEANOR K. BELTRAMINI, HIS WIFE, *ET AL.*, DEFEND-ANTS-INTERVENORS-APPELLANTS, AND JOHN A. BYREM AND ELEANOR P. BYREM, HIS WIFE, DEFEND-ANTS-INTERVENORS.

Argued February 3, 1964 and April 20, 1964—Decided June 24, 1964.

*Mr. Samuel M. Lyon, Jr.,* argued the cause for defendant-appellant; *Mr. Merritt Lane, Jr.,* argued the cause for defendants-intervenors-appellants (*Mr. Ross B. Abrash,* on the brief; *Messrs. McCarter & English,* attorneys for defendants-intervenors-appellants).

*Mr. Frederick J. Gassert* argued the cause for plaintiffs-respondents (*Mr. Thomas H. Gassert,* of counsel; *Messrs. Gassert, Murphy & Gassert,* attorneys).

*Mr. Joseph A. Hoffman,* Deputy Attorney General, argued the cause for the State of New Jersey (*Mr. Arthur J. Sills,* Attorney General, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. This is a zoning case. In October 1960 plaintiff, Roman Catholic Diocese of Newark, purchased a parcel of some 20 acres in the most highly restricted residence district (R-1) of the Borough of Ho-Ho-Kus upon which it

intended to erect a regional high school for some 1,500 boys. At the time of the purchase, the zoning ordinance permitted the contemplated use, but plaintiff's plans led to a reconsideration of the ordinance and finally to an amendment which barred all schools from the R-1 district but continued to permit public and parochial schools through the high-school level in the other three residential districts.

The amendment was assailed upon sundry grounds, including the charge of arbitrariness and denial of due process of law. Much testimony was taken. No findings were made however, the trial court deeming the case to be controlled by *chapter* 138, *L.* 1961, which was adopted during the pendency of the case. That statute, which appears in the annotated statutes as *N. J. S. A.* 40:55–33.1, reads:

> "No planning or zoning ordinance heretofore or hereafter enacted by any municipality governing the use of land by, or for, schools shall, by any of its terms or provisions or by any rule or regulation adopted in accordance therewith, discriminate between public and private day schools, not operated for profit, of elementary or high school grade."

On its face, the ordinance in question applies equally to public and private schools, but the trial court held that a municipality cannot zone with respect to public schools and hence a zoning restraint upon a private school is necessarily discriminatory. We certified the ensuing appeal before argument in the Appellate Division.

We are unable to accept the trial court's view of the statute. The statute obviously was drawn on the thesis that a municipality may zone as to public schools and upon that premise sought to insure equality of zoning treatment for private schools. A legislator voting for that law could hardly have understood it to mean that thenceforth a private school shall be immune from zoning. That, of course, is the effect of the trial court's treatment of the statute. If the Legislature so intended, it would have said so in such simple terms. It would not ordain that private schools shall be subject to non-

discriminatory zoning in order to say they shall not be subject to any zoning at all.

If public schools are beyond the local zoning power, then the statute in question is meaningless and a nullity. We cannot, however, say the Legislature erred in assuming the zoning power does apply. No statute expressly exempts public schools from zoning and no judicial decision has found the exemption. Indeed, we heretofore assumed that public schools are subject to zoning. See *Yanow v. Seven Oaks Park, Inc.,* 11 *N. J.* 341 (1953) ; *Andrews v. Ocean Twp. Board of Adjustment,* 30 *N. J.* 245 (1959) ; *St. Cassian's Catholic Church v. Allen,* 40 *N. J.* 46 (1963) ; but *cf. Trinity, &c., Church v. Morris Plains Bd. of Adjustment,* 72 *N. J. Super.* 425, 431–32 (*App. Div.* 1962).

Plaintiff cites *Bloomfield v. New Jersey Highway Authority,* 18 *N. J.* 237, 244 (1955) ; *Aviation Services, Inc. v. Morristown,* 20 *N. J.* 275 (1956) ; and *Washington Twp. v. Ridgewood,* 26 *N. J.* 578 (1958), in which it was held that the particular public projects involved were not subject to the zoning ordinance of the municipality in which they were situate. In each of those cases there was the likelihood of a conflict in interest which could defeat or hamper the project if the zoning power were applicable. In *Bloomfield* the project was restaurant and service station facilities on a toll highway. In *Aviation Services* the project was a municipal airport authorized by statute to be developed within the borders of another municipality. And in *Washington Township* the statute authorized a municipality to condemn lands in another municipality in connection with its water needs. We concluded in each case that the Legislature intended the municipality in which the improvement was to be located should not be able to block it by zoning.

Here the prospect of discord is quite remote, for the school districts, whether regional or not, share a common interest with the municipalities themselves. Ordinarily there is no reason for a school board and the local governing body to quarrel about zoning matters. Hence, although unques-

tionably the school board as the State's agent to discharge the State's constitutional duty to provide for a system of free public schools, *Art.* VIII, § IV, *par.* 1, is a distinct entity essentially independent of the local governing body, *Gualano v. Board of School Estimate,* 39 *N. J.* 300, 303 (1963); *Botkin v. Westwood,* 52 *N. J. Super.* 416, 425 *et seq.* (*App. Div.*), appeal dismissed 28 *N. J.* 218 (1958), there is a community of interest which augurs for good relations between them. Of course the Legislature could place the public school beyond the zoning power as it is in some jurisdictions, see *Town of Atherton v. Superior Court,* 159 *Cal. App.* 2d 417, 324 *P.* 2d 328 (*D. Ct. App.* 1958); *Congregation Temple Israel v. City of Creve Coeur,* 320 *S. W.* 2d 451, 454 (*Mo. Sup. Ct.* 1959), but we see no constitutional command that it do so.

█ Plaintiff cites *N. J. S. A.* 18:11-11 which provides that the plans and specifications for a school building are not subject to municipal approval and a building permit shall not be required. *Kaveny v. Montclair,* 71 *N. J. Super.* 244 (*App. Div.*), certif. denied 36 *N. J.* 597 (1962). That statute must be considered with *R. S.* 18:11-8 which requires approval of such plans and specifications by the State Board of Education. Indeed *N. J. S. A.* 18:11-11 comes from *L.* 1928, *c.* 186, where it appeared as a proviso to what is now *R. S.* 18:11-8. The reason for the 1928 statute is given in its sponsoring statement:

"All work in connection with the erection or alteration of school buildings is under the supervision of the State Board of Education. The Attorney General has ruled that a local building permit is not necessary in connection with school work. Some still feel that a local permit is necessary. The purpose of this act is to definitely settle the question."

In short, the subject having been committed to a state agency, the municipal role was eliminated to avoid a division of responsibility.

Thus with respect to the sufficiency of the school plant itself the Legislature has both vested responsibility in a state agency and expressly barred the municipality. No such

legislation exists as to zoning. In this connection we are referred to *N. J. S. A.* 18:2–4, *subd. h* under which the State Board of Education "may" withhold approval of a "secondary school" if its "location" shall not warrant its establishment or continuance. That statute quite plainly does not charge the State Board with responsibility for the total zoning interests of the community but rather enables the State Board permissively to disapprove a specific site because it is unsuitable in the limited context of the need for and utility of a secondary school.

And so also *N. J. S. A.* 40:55–1.13 does not bespeak a purpose to place schools beyond the zoning power. That statute, which applies only if a planning board has adopted a master plan or a portion of a master plan, provides that the governing body or other public agency "before taking action necessitating the expenditure of any public funds, incidental to the location, character or extent" of a project, shall refer the proposal to the planning board for review and recommendation. A "school board" is specifically listed among the agencies subject to this requirement. The statute provides that the recommendation of the planning board may be overridden, and for present purposes we may accept the Attorney General's opinion that a school board may override the recommendation without the concurrence of the municipal governing body. *Op. A. G.* 1954, *No.* 8. The statute, however, does not relate to compliance with zoning restrictions. Rather it deals with the suitability of a specific site or location for a public improvement, see *Saddle River Country Day School v. Saddle River*, 51 *N. J. Super.* 589, 602 (*App. Div.* 1958), affirmed o. b. 29 *N. J.* 468 (1959), and hence, although a school board has the final say with respect to the precise location, it does not follow that it may ignore the zoning ordinance.

In summary, then, there is no statute under which zoning responsibility with respect to public schools has been vested in another agency or expressly denied to the municipality. We see no reason, therefore, to dispute the assumption

in *N. J. S. A.* 40:55-33.1 that public schools are subject to local zoning.

We of course do not mean that the Legislature intended that the governing body may block public education by barring schools throughout the municipality or by relegating schools to areas that are obviously unsuitable. Rather the Legislature found it appropriate to permit the municipality to consider the total needs of the community in all of its zoning aspects to the end that schools will be in appropriate districts and upon plots of ample size and with suitable buffers to contain within the perimeter of the property those influences which could be unduly hurtful to others.

This discourse upon the amenability of public schools to zoning should not obscure the question before us. That question is whether the Legislature intended private schools to be beyond zoning control. While undoubtedly the public interest could be left with the school board, it would be poor policy to permit private schools to locate anywhere at all and to be unrestrained as to size of plot, sideyards, etc. The private organization is not accountable to the electorate directly or indirectly, and even if it wanted to keep in mind the total zoning interests of the community, still it could not draw upon a power to condemn or to tax in its quest for the optimum location. We should hesitate to impute so questionable a purpose to the Legislature.

Plaintiff alternatively suggests the statute be read to permit zoning regulation as to lot size, setback, buffers, etc., but not as to land use. Thus a private school could locate its facilities in any district but would have to obey local regulations reasonably designed to insulate the neighborhood from the noise and activity which schools, especially secondary schools with their athletic facilities, can readily generate. This approach would be more palatable as a policy matter than the approach we rejected above, but the answer is that the Legislature has not adopted it.

The statute is plain enough if it is read without stress and strain. There is disagreement upon whether public schools

may constitutionally be treated differently in zoning matters from private schools furnishing equivalent education. See *Tustin Heights Ass'n v. Board of Supervisors,* 170 *Cal. App. 2d* 619, 339 *P. 2d* 914, 922–23 (*D. Ct. App.* 1959); *St. John's Roman Catholic Church v. Darien,* 149 *Conn.* 712, 184 *A. 2d* 42 (*Sup. Ct. Err.* 1962); *City of Miami Beach v. State,* 128 *Fla.* 750, 175 *So.* 537 (*Sup. Ct.* 1937); *Catholic Bishop of Chicago v. Kingery,* 371 *Ill.* 257, 20 *N. E. 2d* 583 (*Sup. Ct.* 1939); *Diocese of Rochester v. Planning Board,* 1 *N. Y. 2d* 508, 154 *N. Y. S. 2d* 849, 136 *N. E. 2d* 827, 834 (*Ct. App.* 1956); *State v. Sinar,* 267 *Wis.* 91, 65 *N. W. 2d* 43 (*Sup. Ct.* 1954). We adverted to the question without deciding it in *Andrews, supra* (30 *N. J.,* at p. 252). The statute before us resolved that issue by requiring equality of treatment. We so read the statute in *St. Cassian's Catholic Church, supra* (40 *N. J.* 46). That case involved a variance for a parochial school granted before the statute was enacted, and the question was whether one of the conditions of the variance discriminated against the school in violation of the statute. We did not say the statute placed private schools beyond zoning control and hence the variance was no longer needed. Rather we accepted the continued vitality of the variance, and upheld the condition upon a finding that other public schools met the requirements of that condition and hence there was no discrimination in fact.

Here the ordinance applies equally to public and private schools. The borough is small, with an area of but 1.76 square miles and 3,988 residents as of the 1960 census. It is almost wholly residential. About half its area is in the R-1 district. The R-1 district has the highest requirements of the four residential districts, is countrified in atmosphere and facilities, and the homes are in the $60,000 class on lots of one-acre minimum. A public elementary school situate in the R-3 district is centrally located and there was testimony that it will meet the total need even when the municipality is fully developed. As to secondary education, the borough has provided for instruction by contract with the Village of Ridge-

wood at its high school. There was testimony that the borough would never need a secondary school of its own. Also in the R-3 district is St. Luke's Regional Parochial School, which is both an elementary and a secondary school, with a student population of 1,512, of whom 164 reside in the borough. In this setting the municipality barred both public and private schools from the R-1 district.

■■ The ordinance is nondiscriminatory as between public and private schools. If there is a grievance, it is of another kind. The municipality has zoned in terms of its own local need, whereas plaintiff wishes to meet a regional need through a facility of relatively little utility to the residents of the borough. Not every municipality will welcome a taxexempt enterprise whose contribution is essentially extraterritorial. Hence motivations are suspect when at a late hour an ordinance is adopted to bar the improvement on a site already in hand. Perhaps the problem should be given to a state agency removed from the pull of local interests. Indeed, we directed reargument to explore the question whether the State Board of Education has jurisdiction of it. We are satisfied it does not and hence the case must be adjudged under a statutory scheme which leaves the zoning decision in municipal hands.

The substantial issue upon which the trial court made no finding is whether it is arbitrary to bar the use of plaintiff's property for a secondary school. The issue is constitutional insofar as it is claimed that the ban offends due process of law. The issue is also statutory insofar as it involves the question whether the municipality exceeded the statutory authority or departed from state policy. In this connection it is appropriate to comment upon so much of the testimony and argument as stresses the tax implications of the proposed use.

We have held that a municipality may consider revenues in its plan for a well balanced community. *Gruber v. Raritan Twp.*, 39 *N. J.* 1, 9–11 (1962). Thus it may provide for industrial or commercial uses which are less demanding in public services than residential uses. It is, however, another

matter to bar tax-exempt facilities on the ground that they are financially burdensome by reason of that exemption. The exemption is granted by the State because of the contribution of the exempt facility to the public good. It may be that an exemption will mean a net burden for the taxpayers of a particular municipality, but the municipality must nonetheless abide by state policy. Indeed, our *Constitution of 1947* expressly preserved the then existing exemptions of real and personal property used exclusively for religious, educational, charitable or cemetery purposes and owned by a nonprofit corporation or association. *Art.* VIII, § I, *par.* 2. And *N. J. S. A.* 40:55–33.1, while not bearing the interpretation given it in the trial court, does serve to evidence the Legislature's concern for nonprofit private schools which furnish elementary and high school education.

█ No municipality may quarrel with this policy. Hence it may not zone against a private school, place it in one district rather than another, or refuse it a variance on the ground that it is exempt from taxation. See *Diocese of Rochester v. Planning Board, supra* (1 *N. Y. 2d* 508, 154 *N. Y. S. 2d* 849, 136 *N. E. 2d*, at *p.* 836).

██ The matter is remanded for trial of the issue of arbitrariness in the light of the views we have expressed. We should add that if it is held to be unreasonable to bar the proposed use upon a finding that the zoning objective may be readily achieved by appropriate regulation as to plot size, setback, buffers, etc., the municipality should be given an opportunity to legislate to that end.

█ As to the other issues presented to us, we think it enough to state our conclusions. We see no merit in plaintiff's attack upon the procedure used in adopting the amendatory ordinance nor in the charge that a councilman had a disqualifying interest. Nor do we find substance in defendant's sundry constitutional attacks upon *N. J. S. A.* 40:55–33.1, and we add that as to the charge that the statute invidiously discriminates between profit and nonprofit private schools, the statute would not fall in its entirety if the challenge were

good for the reason that the offending words would be severable, and hence the issue is not involved in this case.

 If it wishes, plaintiff may seek a variance at this juncture, and if the variance should be denied, litigate the validity of that action along with the attack upon the ordinance itself.

The judgment is reversed and the matter remanded for further proceedings not inconsistent herewith.

FRANCIS, J. (dissenting). The courts of New Jersey have never been called upon to.decide the specific question whether a municipality has authority to control the location of a public school by means of a zoning ordinance. In my judgment no such authority exists and therefore the provision of the Ho-Ho-Kus ordinance barring such schools from the R-1 residence zone is *ultra vires* and invalid. Thus, it cannot operate as a preventive measure against the Ho-Ho-Kus Board of Education. Consequently, the provision, if effective at all, undertakes to exclude only private schools from the zone. Such exclusion of private nonprofit high schools constitutes discrimination contrary to the intent and spirit of *N. J. S. A.* 40:55–33.1, *L.* 1961, *c.* 138, and is therefore void.

But even if the statute were not in existence, so far as the plaintiff is concerned, the result should be the same. If public schools are not or cannot be banned from a residence district under a municipal ordinance, I do not believe a nonprofit private school can be excluded. See *Brandeis School v. Village of Lawrence,* 18 *Misc. 2d* 550, 184 *N. Y. S. 2d* 687 (*Sup. Ct.* 1959); *In re O'Hara,* 389 *Pa.* 35, 131 *A. 2d* 587 (*Sup. Ct.* 1957); *Diocese of Rochester v. Planning Board,* 1 *N. Y. 2d* 508, 154 *N. Y. S. 2d* 849, 136 *N. E. 2d* 827 (*Ct. App.* 1956); *Catholic Bishop of Chicago v. Kingery,* 371 *Ill.* 257, 20 *N. E. 2d* 583 (*Sup. Ct.* 1939); *City of Miami Beach v. State ex rel. Lear,* 128 *Fla.* 750, 175 *So.* 537 (*Sup. Ct.* 1937). And an attempt to ban the latter would be arbitrary and discriminatory.

Education of our children has a place at the summit of community activities. *Article* VIII, § IV, *paragraph* 1 of the New Jersey Constitution imposes a mandate on the Legislature to provide for the maintenance and support of a thorough and efficient system of free public schools. Obedient to the directive, the lawmakers have legislated extensively in the field of both publicly and privately furnished education. A state board of education has been created and invested with broad supervisory power over all aspects of education. *N. J. S. A.* 18:2–1, 18:2–4. Likewise school districts were established throughout the State (see, *e. g., N. J. S. A.* 18:5– 1.1), and provision made for appointment or election of boards of education to control and regulate the manner and means of furnishing of education therein subject to the over- all supervisory authority of the state board. *R. S.* 18:6–1 *et seq.*, 18:7–1 *et seq.*

A local board of education is an independent, autonomous corporate instrumentality of government within its territorial limits. As such, within its sphere of operation, it is not sub- ject to the will or direction of the governing body of the municipality in which it functions, except to the extent that interdependence or connection has been imposed by the Legis- lature, either expressly or by inescapable implication. *Gualano v. Bd. of Estimate of Elizabeth School Dist.*, 39 *N. J.* 300, 303 (1963).

Local boards of education have power to do all things nec- essary for the lawful and proper conduct, equipment and maintenance of the public schools of the district. See, *e. g., R. S.* 18:6–17. And they are empowered to acquire land by purchase or condemnation for the purpose of building schools. *N. J. S. A.* 18:6–24, 18:7–74, 18:7–110. The power to pur- chase or condemn is nowhere made subject to zoning ordi- nances, nor can there be found any restriction on the location of property within the municipal boundaries which may be acquired for the purpose. In fact, in some situations the board may purchase or condemn up to 25 acres for such pur- pose "in any municipality or municipalities adjoining the

[school] district." *N. J. S. A.* 18 :7–74. Absent some limitation, it must follow that land in any residential area of the particular municipality is subject to condemnation. In *State v. Ferriss,* 304 *S. W. 2d* 896 (*Mo. Sup. Ct.* 1957), the school district sought to condemn a 32.26-acre tract in the City of Ladue as the site for a new school. The land was in a district zoned exclusively for residence. The school district had been given power by the legislature to condemn property for schools in much the same language as the New Jersey statute. The Supreme Court of Missouri held the zoning ordinance inapplicable. It said that clearly the school district was vested by express grant from the legislature with the absolute power to select, locate and procure the site in question by condemnation. And the court declared the authority of a municipality to abrogate state law is never implied or inferred. "It is only derived from express grant, never from a general grant of power. A state policy may not be ignored by a municipality unless it is specifically empowered so to do in terms clear and explicit." Since no such specific grant of power was shown, the city could not by its "zoning regulation prevent the location of a school within its borders and thereby prohibit the performance by the school district of the duty imposed upon it by law." 304 *S. W. 2d,* at *p.* 902.

Here it may be noted that in our State (subject to *R. S.* 18 :14–5, not here pertinent), school districts are under a mandate also to provide suitable public school facilities and buildings. *R. S.* 18 :11–1. They are subject to sanctions if they fail to do so. *N. J. S. A.* 18 :11–2; and, see *Durgin v. Brown,* 37 *N. J.* 189 (1962) ; *Board of Educ. v. Atwood,* 73 *N. J. L.* 315 (*Sup. Ct.* 1906), affirmed 74 *N. J. L.* 638 (*E. & A.* 1907).

Further legislative indications that boards of education are not bound by zoning ordinances are to be found. Such boards are not required to obtain municipal approval of their plans and specifications for construction of a school; nor do they have to seek a building permit from municipal authorities. *N. J. S. A.* 18 :11–11; *Kaveny v. Board of Comm'rs.,* 69

*N. J. Super.* 94 (*App. Div.* 1961), certif. denied 36 *N. J.* 597 (1962). Standard plans and specifications for school buildings are drawn at the state level. *R. S.* 18:11–6. Plans and specifications for a new public school must be approved by the state board of education and, once approved, cannot be changed without state board permission. *N. J. S. A.* 18:11–8. Local plumbing codes do not apply to public schools. *Kaveny v. Board of Comm'rs., supra.* Moreover, the State Commissioner of Education is authorized to order the making of physical changes in school buildings at any time. *R. S.* 18:11–12. The statute contains no language suggesting that limitations of a zoning ordinance could stand in the way of such changes. And, finally, the board of education may overrule any action of a municipal planning board with respect to the location of a public school. *N. J. S. A.* 40:55–1.13; and *cf. Opinion, Attorney General,* 1954, *No.* 8. Such action at best would be advisory and not binding on the board. *Town of Atherton v. Superior Court,* 115 *Cal. App.* 2d 417, 324 *P.* 2d 328 (*D. Ct. App.* 1958).

In passing it may be noted as of particular pertinence here (since we are concerned with the proposed establishment of a high school) that as far back as 1911 the Legislature gave the State Board of Education authority to withhold approval of the location of any "secondary school." *L.* 1911, *c.* 231. Such a school is an intermediate one between the elementary grades and the college or university. *Webster's New International Dictionary* (2d ed. 1949), *p.* 2260; *N. Y. Education Law,* § 2. That statute has been continued in force unaffected throughout the years of the developing zoning concept and was retained in the most recent revision. *L.* 1954, *c.* 81; *N. J. S. A.* 18:2–4(h). Thus, at least the state board would seem to have the power to veto a site selected by the local board of education for a secondary school. Suppose the vetoed site were the only one available in the only zone where schools were permitted under a municipal ordinance, and a school was needed in the community. Is it conceivable that a prohibition against schools even in the most

highly restricted residential zone could stand in the way of a school there? Incidentally, the veto power appears to be a broad one and undoubtedly should be considered adequate to permit the state board to deal reasonably with matters such as area of plot in relation to size of school, play yards, sidelines and front and rear setback lines.

The foregoing demonstrates convincingly that the Legislature has not empowered a municipality to bar a public high school from its most highly restricted residential zone. Or, to put it another way, the lawmakers have not withdrawn or withheld from local boards of education the authority to exercise their own independent judgment as to where their schools shall be located. Certainly the authority has not been withheld or withdrawn expressly so as to permit local zoning power to interfere. I believe Judge Conford was on sound ground when he said in *Trinity Evangelical Lutheran Church v. Board of Adjustment*, 72 *N. J. Super.* 425, 431 (*App. Div.* 1962):

"Certainly a board of education could not have been denied leave to establish a public school at this location on either the theory that it was detrimental to the public health, safety and general welfare, or not reasonably necessary for the convenience of the community."

(The extent to which the local board of education may be subordinate to the state board as to the location of secondary schools, by virtue of *N. J. S. A.* 18:2–4(h), or as to the location of elementary schools under the broad statutory grants of power to the state board, need not be decided.) New Jersey is therefore in tune with the weight of authority throughout the country. See 1 *Rathkopf, Law of Zoning and Planning* (3d ed. 1964), p. 18–1 et seq.; *Basset, Zoning*, pp. 31, 196 (1940); 2 *Metzenbaum, Law of Zoning* (2d ed. 1955), p. 1455; 2 *Yokley, Zoning Law and Practice* (2d ed. 1953), § 247, p. 141; Note, "The Immunity of Schools from Zoning," 14 *Syracuse L. Rev.* 644 (1963).

The majority opinion says in effect that *chapter* 138 of the *Laws of* 1961 is inconsistent with the idea that the author-

ity of local boards of education to locate their schools is paramount to the zoning power of the municipality. I agree that the statute may be somewhat ambiguous. Its meaning is not uncertain, however. One light which floods all of its recesses and illuminates the legislative intention beyond doubt is that the lawmakers wanted no discrimination between public and nonprofit private schools in the matter of their location in a municipality.

Moreover, I cannot agree that the statute obviously was drawn on the thesis that a municipality may zone as to public schools. Its text seems just as consistent with the thesis that since public schools are not subject to zoning restrictions, a municipality should not discriminate against nonprofit private schools by means of planning or zoning restrictions affecting them alone. Note, also, that the statute invalidates discriminatory ordinances "heretofore" adopted, as well as forbidding all new ones of like tenor. Undoubtedly the Legislature was aware that some municipalities, unsure of their zoning power, *vis-a-vis* the school board in the absence of definitive judicial decision, had assumed to zone with respect to schools. And so it employed the terse language of the act to express its anti-discrimination idea. That it did not use crystal clear expression ought not to stand in the way of the accomplishment of its intention. Public policy favors nonprofit private schools. That is the reason for their tax-exempt status. With that policy in mind, doubts engendered by words or contextual arrangement ought to be resolved in favor of an interpretation preventing discrimination against such schools.

Since the Ho-Ho-Kus ordinance as a matter of law cannot apply to public schools, its effect is to prohibit nonprofit private schools in the R-1 residence district. Discrimination is thus apparent and must be considered as within the condemnation of *L*. 1961, *c*. 138. More than this, the exclusion of schools from the district appears to have been aimed at plaintiff's high school. The borough's brief says "there never will be sufficient children of high school age within the Borough

so as to permit it to erect its own high school." The amendment to the ordinance drawn with that knowledge in mind, and adopted by the governing body when plaintiff was actively seeking to build its school, rendered lip service to equality of treatment by ostensibly barring public as well as private schools from the zone. But, in fact, it rendered actual service to the cause of discrimination.

But, even if the 1961 anti-discrimination act did not exist, the contested part of the ordinance would have to be invalidated as to plaintiff. Accepting the premise which I consider unavoidable, that location of public schools is not subject to municipal zoning, the attempt to prohibit nonprofit private schools in the R-1 zone, where public schools may go in the discretion of the board of education, is discriminatory and arbitrary. In order to subject private property to zoning, the restriction imposed must bear some substantial relation to the health, safety, morals or general welfare of the community. In this connection it seems fair to say with respect to zoning that public schools and nonprofit private schools involve substantially the same considerations. Private schools operated for profit may present a different question from a zoning standpoint. Perhaps such institutions may be considered as establishing a business use in a residence zone. That problem is not before us. On the record of the present case, however, the various reasons advanced by the borough for excluding schools from the area would apply equally to a public high school. Generally speaking, they are: increased traffic, need for widening roads in the school area, interference with the tranquillity of the residence area, alleged depreciation of other property in the zone, probable need for increased fire and police protection, loss of tax revenue, and other claims of possible increased municipal burden. In view of the intense public interest in education, whether the schools furnishing it are publicly operated or privately run under a curriculum approved by state authority, the objections urged against the high school do not bear a sufficiently important relation to the public health, safety or welfare to justify the limitation

sought to be imposed on the desired use of plaintiff's property.

In *Diocese of Rochester v. Planning Board, supra,* a zoning ordinance of the Town of Brighton barred a nonprofit private school from the Class A residential zone unless a permit was granted by the planning board. The Diocese sought and was denied permission to build a parochial school in the district. The Court of Appeals of New York reversed the denial, saying among other things:

"The text writers agree that churches and schools should be allowed in Class A residential areas which are usually the quietest and least congested areas of a town. * * * It is well established in this country that a zoning ordinance may not *wholly exclude* a church or synagogue from any residential district. Such a provision is stricken on the ground that it bears no substantial relation to the public health, safety, morals, peace or general welfare of the community. * * * An ordinance will also be stricken if it attempts to exclude private or parochial schools from any residential area where public schools are permitted. * * *" 154 *N. Y. S.* 2d, at *p.* 858, 136 *N. E.* 2d, at *p.* 834

After referring to a number of cases, the court held that objections to establishment of the school based upon alleged adverse effect on property values, decreased enjoyment of neighboring property, traffic hazards and loss of potential tax revenue as a matter of law were not sufficient to warrant the action of the planning board. Among other things, the opinion indicated also that it is not a proper function of government to interfere in the name of the public to exclude schools from residential districts for the purpose of securing to adjacent landowners the benefit of exclusive residential restrictions. With respect to loss of tax revenue, it pointed out that the Constitution had exempted such institutions as churches and nonprofit schools from taxation. And it said:

"Thus the paramount authority of this State has declared a policy that churches and schools are more important than local taxes, and that it is in furtherance of the general welfare to exclude such institutions from taxation. This being the case, it cannot be seriously argued that the decision of respondents denying this permit because of a loss of tax revenue is in furtherance of the general welfare.

\* \* \* \* \* \* \* \*
Thus church and school and accessory uses are, in themselves, clearly in furtherance of the public morals and general welfare. The church is the teacher and guardian of morals, \* \* \* and 'an educational institution, whose curriculum complies with the state law, is considered an aid to the general welfare.' \* \* \* These proposed structures will not interfere with the public health, nor can they be said to be a danger to the public peace or safety; \* \* \*" *Id.*, 154 *N. Y. S. 2d*, at *p.* 861, 136 *N. E. 2d*, at *pp.* 836–837.

In conclusion, the action of the planning board was held to "bear no substantial relation to the promotion of the public health, safety, morals or general welfare of the community." Therefore, it was deemed arbitrary and unreasonable and was ordered annulled.

In *Brandeis School v. Village of Lawrence, supra,* the zoning ordinance was amended to exclude public and private schools from certain residential districts of the village. Plaintiff sought to establish its school in one of the residence districts in three buildings, two already in existence and a third to be constructed. It was to be a nonprofit school of elementary grades, with a secular curriculum approved by the state education authorities, and a religious curriculum as well. The students were to be drawn from five surrounding towns.

The proof showed, among other things, that the last public school built in the village was a high school in the same district as plaintiff's property. Plaintiff contended that when the high school was completed, the public school needs of the village were met and then the zoning ordinance was amended to keep out all private schools. It urged from the sequence of events that although ostensibly the amended ordinance treated public schools and private schools alike by banning both from the district, in reality it discriminated between public and private schools by excluding the latter when it was no longer necessary to make provision for public schools. (Mention is made of this factual situation because it is analogous to the course taken by Ho-Ho-Kus in adopting the amendment in dispute here.)

The trial court declared the amendment invalid saying that it bore no such substantial relation to the public welfare in the zoning sense as would justify its adoption. Possible disadvantages which might be visited on the neighborhood were treated as outweighed by the social value of the institution.

In addition, reference was made to the holding of the Court of Appeals in the *Diocese of Rochester* case, cited above, that an ordinance will be stricken if it attempts to exclude parochial schools from any residential area where public schools are permitted. And the court said:

"While it may well be, as defendant's counsel has painstakingly shown, that public and private schools have many characteristics which distinguish them from one another organizationally, these differences are not of sufficient importance, in the light of our highest court's expressed views, to justify different treatment in a zoning ordinance. Therefore, the Court finds that the ordinance in question discriminates against private schools." 184 *N. Y. S.* 2d, at *p.* 697.

In *Board of Zoning Appeals v. Schulte,* 241 *Ind.* 339, 172 *N. E.* 2d 39 (*Sup. Ct.* 1961), the zoning ordinance provided a church or school could not be built in the residence zone unless the Board of Zoning Appeals found it to be on a lot so located that the building would "substantially [serve] the public convenience and welfare and [would] not substantially or permanently injure the appropriate use of the neighboring property." The Archdiocese of Indianapolis desired to build a church and parochial school on property owned by it in the residence district of Meridian Hills. The Board of Zoning Appeals denied permission.

The denial was based upon evidence that property in the neighborhood would be depreciated if the church and school were permitted. The Supreme Court of Indiana, in reversing the board, said zoning ordinances must support their validity in the police power of the state, which can only be exercised in the general public interest of safety, health and morals, and that the right to use private property could not be restricted except upon that basis. And "[i]t was never intended that

zoning laws should be used for the purpose of creating special privileges or private rights in property which result from creating an exclusive community." 172 *N. E. 2d,* at *p.* 43.

Apparently the board's refusal gave some recognition also to the contention that the proposed facilities should be located on another street (where the court pointed out, the traffic was heavier) in order not to disturb the neighborhood where the traffic was admittedly lighter. The Supreme Court rejected that reason as invalid saying:

"Traffic safety, particularly for children, is a matter of general public concern and far outweighs the private interest involved in a quiet neighborhood. It likewise occurs to us that the fact that the 75th Street area might be one in which families with few children or no children are to be found, could not be made the basis for excluding from such area projects of public welfare, such as the church and facilities, in which children are involved. To exclude children's activities by zoning restrictions from [such] areas would appear to us to be the converse of what is normally considered general public welfare.

\* \* \* \* \* \* \* \*

\* \* \* We do not feel that any zoning board may zone on the basis that children are undesirable in certain areas and that families without children should be protected against such intrusions." 241 *Ind.* 339, 172 *N. E. 2d,* at *p.* 42.

The court not only adjudged invalid the action of the Board of Zoning Appeals but indicated also that if the ordinance simply banned a church and school from the zone without providing for the review by the board, denial of a variance would be invalid. 172 *N. E. 2d,* at *pp.* 44–45.

The majority opinion here remands the case for a determination whether the amendment to the zoning ordinance constitutes arbitrary action. It seems to me that on the extensive factual record made below and the authorities I have cited, as well as *Trinity Evangelical Lutheran Church v. Board of Adjustment, supra,* the borough's action was clearly arbitrary. Under the circumstances, that decision should be made by us now.

For the reasons stated, I believe the ordinance is invalid as to the plaintiff, and that the judgment of the trial court should be affirmed.

The majority opinion indicates that, upon the remand ordered, plaintiff is not precluded from applying for a variance to the appropriate local authority and, if the result is adverse, join an attack thereon with the present proceeding. Although I have expressed the conviction that as a matter of law plaintiff is entitled to favorable judgment now, manifestly, in view of the majority holding on the issue before us, pursuit of a variance would be feasible. In that case, however, on the record before us, the right to a variance is obvious, subject only to the question whether in the discretion of the board of adjustment the grant should be made subject to any reasonable conditions relating to front and rear setback lines, side yards, play areas, etc. *Andrews v. Ocean Twp. Board of Adjustment*, 30 *N. J.* 245, 248 (1959).

*N. J. S. A.* 40:55-39(d) authorizes the granting of a variance for "special reasons." On the thesis that such reasons existed, this Court in *Andrews* approved allowance of a variance for establishment of a parochial school in a residential district zoned against it. We found "no infirmity" in the circumstance that the children to attend the school would be drawn from neighboring communities as well as from Ocean Township. *Cf. Trinity Evangelical Lutheran Church v. Board of Adjustment, supra; Brandeis School v. Village of Lawrence, supra.* We said also that the school not only involved no "detriment to the public good," but in fact served the public welfare. 30 *N. J.*, at *pp.* 249, 251.

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—Justice FRANCIS—1.